Alveda King BEAL, Plaintiff,

v.

PARAMOUNT PICTURES, Eddie
Murphy, Art Buchwald, et
al., Defendant.

Civ. No. 1:91–CV–1266 JEC.

United States District Court,
N.D. Georgia,
Atlanta Division.

Aug. 10, 1992.

Earline Smith–Montgomery, Atlanta, Ga., for plaintiff.

June Ann Sanders & Nicholas N. Leach, Atlanta, Ga., for defendant.

## ORDER

CARNES, District Judge.

This case is presently before the court on the defendants' motion for summary judgment [8–1] and Eddie Beal's motion to intervene [22–1]. This Court has reviewed the record and the arguments of the parties and, for the reasons set out below, GRANTS the motion for summary judgment and DENIES the motion to intervene.

The plaintiff filed her complaint alleging that defendants infringed her copyright in her book, *The Arab Heart*. The allegedly infringing work was the movie written by and starring Eddie Murphy, "Coming to America."

## FACTS

This court has reviewed the two works. The plaintiff, Alveda King Beal, describes *The Arab Heart*, on its cover, as a "historical tale of romance and adventure." The book's protagonist is Sharaf Ammar Hakim Riad, an Arabian prince in the country of Whada. The book opens with Sharaf riding on a horse across the desert, contemplating his grandfather's, the king's, "command" that he travel to the United States to "attend an American college with a great reputation for technical training." *The Arab Heart* [hereinafter AH, at 3, 2]. Whada is a poor country, and the king wants the prince to receive a technical education that will enable him to improve the country's oil production. Initially reluctant, Sharaf agrees to go and decides to attend the Georgia Institute of Technology (Georgia Tech) in Atlanta, where he lives in a comfortable boarding house near campus with a roommate and the bodyguards that the king has sent with him.

Meanwhile, Sharaf's grandfather has had a long war with his half-brother, Mansur, who repeatedly launches terrorist attacks against the king. At Christmas break, the king orders Sharaf home, under the guise of a trip with his roommate, to prepare him to lead the country should the king be killed. In the spring, Sharaf returns to Whada to help fight Mansur in a battle in which Sharaf and the king kill one of Mansur's sons. Sharaf then finishes the year at Georgia Tech.

While Sharaf is in Atlanta, he first dates a woman named Claire Eastman, a cold, opportunistic, white woman from a wealthy family in Boston. Sharaf and Claire share a passionate, extremely physical relationship and Sharaf considers proposing marriage to her, but is concerned whether Claire, whom he suspects of harboring racial prejudices, would be tolerant of and adapt to the very different cultural traditions of Whada.

At the same time that he is involved with Claire, Sharaf becomes interested in another woman, Flora Johnston, a quiet, reserved woman from an affluent family in Savannah. Flora is the offspring of a marriage between a white man and a black woman. Smitten with Sharaf, Flora attempts to gain his attention by performing a sensual belly dance at a Halloween party at which Sharaf and a jealous Claire attend. Although her provocative dance does succeed in capturing the attention of Sharaf, he believes that his feelings for Flora are "brotherly" (AH at 68) and he continues his relationship with Claire, still pondering whether he should ask her to marry him.

Sharaf's dilemma is resolved later when he overhears Claire telling a friend that she would never accept Whadan customs. At that point, he ceases his involvement with Claire and begins a passionate relationship with Flora. Notwithstanding his grandfather's previously expressed wish that Sharaf agree to an arranged marriage in Whada, four weeks later Sharaf and Flora mar-

ry during a small, ceremony in Savannah, after which they return to Whada.

In Whada, Flora has difficulty adjusting to the Whadan customs, particularly the treatment of women. Indeed, Sharaf's grandfather, the king, will not accept her into the family until she bears a son. Flora is also concerned about the social conditions in the country, particularly, the poverty. Flora and Sharaf's relationship becomes extremely strained when Flora, who is pregnant at the time, discovers Sharaf in bed with a servant girl.

Flora bears a son, and while she and Sharaf are still estranged, Mansur attacks once again, trying, with the assistance of Sharaf's servant girl paramour, to kidnap his and Flora's infant son. In the ensuing altercation, Mansur and the king are killed, and Sharaf stabs the servant girl. At the end of the book, Sharaf has become the king of Whada. Flora and Sharaf also seem to reconcile, although, because Sharaf's father has advised him that he may continue to pursue extramarital affairs, as long as he is more discreet (AH at 129, 132), the reader is left with the impression that Sharaf has not totally renounced his philandering ways.

"Coming to America" begins by panning miles of lush African jungle. The movie opens on the day of the twenty-first birthday of Prince Akeem of Zamunda, a seemingly opulent and exotic kingdom. On that day, Akeem is to marry the woman that his parents, the king and queen, have chosen for him. Postponing the wedding, Prince Akeem convinces his father that he should have 40 days to "sow his royal oats." He intends to go to America to find a woman who thinks for herself and who will love him for himself, not for his title or his wealth. His father agrees, sending along Akeem's best friend, Semmi. In deciding which city would be the best place to find his wife, the future Queen, Akeem decides that the appropriate locale for such a search is logically Queens, New York.

Arriving in Queens, Akeem rents a rat-infested apartment. Before he even has time to carry his luggage to his apartment, the residents of the neighborhood steal all his belongings, a fact which does not seem to perturb Akeem. Indeed, Akeem tries to hide his identity as a wealthy prince throughout his stay in New York.

In searching for a wife, Akeem and Semmi first go to bars in Queens to meet women, but instead meet only comically inappropriate women there. Another character tells Akeem to go to a Black Awareness Rally to meet a "nice girl." He sees Lisa McDowell there, likes her, and decides to acquire a job in her father's fast-food restaurant in order to meet her. While Akeem and Semmi work in the restaurant, humorous events occur, including Akeem's foiling of an armed robbery with a mop. Shortly thereafter, Lisa breaks up with her boyfriend because of his presumption in having her father announce their engagement at a social occasion, before he had even asked Lisa to marry him.

Akeem and Lisa then begin to date. Several times, in comical scenes, Akeem tries to hide his true identity from Lisa. Semmi, however, who has tired greatly of the poor lifestyle that he and Akeem are leading, wires Prince Akeem's parents for money. Akeem's parents, the king and queen, become disturbed at the news of the impoverished life that Akeem is leading and come to Queens to check on him. When Akeem's parents arrive, Lisa discovers his identity and, as a result, angrily turns down his marriage proposal. Akeem then heads home to Zamunda to enter into the marriage previously arranged by his parents. Akeem's parents have apparently intervened and persuaded Lisa to marry Akeem, however, for, in the last scene of the movie, at the moment that Akeem lifts the veil, expecting to see the face of the "arranged" bride, he instead is pleased to see that Lisa is his bride. Akeem and Lisa drive away to the cheers of jubilant Zamundan citizens and the smiles of their parents.

## DISCUSSION

Rule 56(c), Fed.R.Civ.P., states that summary judgment shall be granted if "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." A factual dispute is genuine "if the evidence

is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The moving party must "always bear the initial responsibility of informing the district court of the basis of its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Once the movant has met this burden, the non-moving party is then required to "go beyond the pleading" and present competent evidence designating "specific facts showing that there is a genuine issue for trial." 477 U.S. at 324, 106 S.Ct. at 2553. The court must take the evidence of the non-movant as true. *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir.1991).

■ To state a claim for copyright infringement, a plaintiff must show that she has a valid copyright and that the defendant copied the copyrighted work. *Benson v. Coca–Cola, Co.*, 795 F.2d 973, 974 (11th Cir.1986). If the plaintiff does not have direct proof of copying, the plaintiff may show copying by demonstrating that the defendants had access to the copyrighted work and that the works are "substantially similar." *Benson*, 795 F.2d at 974. If the plaintiff cannot show access, the plaintiff may still prevail by demonstrating that the works are "strikingly similar." *Ferguson v. National Broadcasting Co.*, 584 F.2d 111, 113 (5th Cir.1978).[1]

In this case, the defendants have conceded that issues of fact exist concerning the plaintiff's valid copyright and the defendants' access to the plaintiff's copyrighted work. The defendants, however, maintain that no genuine issue of material fact exists on the issue of substantial similarity.

■ In order to show substantial similarity, the plaintiff must establish that "an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work." *Original Appalachian Artworks, Inc. v. Toy Loft, Inc.*, 684 F.2d 821, 829 (11th Cir.1982). Copyright protection extends only to expression of ideas, not to ideas themselves. *Reyher v. Children's Television Workshop*, 533 F.2d 87, 90 (2d Cir.1976); 3 Melvill B. Nimmer & David Nimmer, NIMMER ON COPYRIGHT, Section 13.03[A], 13–57 (1992). For example, the basic premise of a fictional work could be the classic theme of "boy meets girl." *Landsberg v. Scrabble Crossword Game Players, Inc.*, 736 F.2d 485, 488 (9th Cir.), *cert. denied*, 469 U.S. 1037, 105 S.Ct. 513, 83 L.Ed.2d 403 (1984). Yet, this basic idea can be expressed in many ways. *Id.* A copyright infringement would occur only if there were substantial similarity in the expression of this general theme.

■ In deciding a motion for summary judgment in a claim involving copyright infringement, the court must decide if the similarities between the works involve similar expressions of ideas, as opposed to the mere articulation of similar general themes. *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 49 (2d Cir.), *cert. denied*, 476 U.S. 1159, 106 S.Ct. 2278, 90 L.Ed.2d 721 (1984). Deciding whether an allegedly infringing work has copied an expression of theme, as opposed to the general theme itself, requires a case by case determination. *Reyher*, 533 F.2d at 90 (citing *Peter Pan Fabrics, Inc. v. Martin Weiner Corp.*, 274 F.2d 487, 489 (2d Cir.1960) (L. Hand)).

■ Further, in determining whether the expression of certain generalized themes or ideas is similar, the court must decide whether any similarities between the two works are "scenes a faire." Scenes a faire are incidents or plot that ordinarily result from a common theme or setting and such scenes a faire are not protectible under the

---

**1.** In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit Court of Appeals adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

copyright laws. 3 Melville B. & David Nimmer, NIMMER ON COPYRIGHT, Section 13.03[B][4], 13–69 (1992); *Reyher*, 533 F.2d at 91, *cert. denied*, 429 U.S. 980, 97 S.Ct. 492, 50 L.Ed.2d 588 (1976); *Evans v. Wallace Berrie & Co.*, 681 F.Supp. 813, 817 (S.D.Fl.1988).

■ In short, a court may determine non-infringement as a matter of law on a motion for summary judgment, either because the similarity between the two works concerns only non-copyrightable elements of the plaintiff's work or because no reasonable jury, properly instructed, would find that the two works are substantially similar. *Warner Bros., Inc. v. American Broadcasting Companies, Inc.*, 720 F.2d 231, 240 (2nd Cir.1983). Having carefully reviewed both works, this court finds summary judgment appropriate on both grounds.

■ At the outset, the court notes that the book and the movie do contain some very general similarities. Both involve a foreign prince coming to the United States. In both a prince is guided by the advice of a strong king, who wishes him to enjoy his wealth and status. While in the United States, each prince meets the woman that he eventually will marry. In both stories, the king has initially expressed a preference for the prince to engage in an arranged marriage. There, thematically, the similarities end, and, in fact, they diverge sharply thereafter.

First, the very general similarities in theme between the two works are not copyrightable. The idea of a prince coming to America is a generalized theme, which is not copyrightable. *Cable/Home Communication Corp. v. Network Prods., Inc.*, 902 F.2d 829, 841 (11th Cir.1990). Other similarities cited by the plaintiff in the works naturally arise from the generalized theme of a foreign prince coming to the United States.[2] Stories about royalty often include domineering kings, arranged marriages, and abundant wealth. Scenes a faire, stock scenes which naturally flow from a common theme, are not copyrightable. *Evans*, 681 F.Supp. at 817. Courts deny claims of copyright infringement when ideas and scenes a faire are the only similarities between the two works. *See, e.g., Evans*, 681 F.Supp. at 818 (Summary judgment for the defendant granted because similarities such as sand dollars as currency, foods made of seaweed, seahorses for transportation, and plates made of oyster were characterizations that naturally flow from the common theme of underwater civilization); *Berkic v. Crichton*, 761 F.2d 1289, 1293 (9th Cir.1985) ("Both deal with criminal organizations that murder healthy young people, then remove and sell their vital organs to wealthy people in need of organ transplants. To some extent, both works take their general story from a young professional who courageously investigates, and finally exposes, the criminal organization. But this degree of similarity between the two plots of two works cannot sustain a plaintiff's claim that the works are 'substantially similar.' ").

This court concludes that the copyrightable parts of the two works, the expressions of ideas, could not be determined by a reasonable jury to be substantially similar. In making this determination, the court has considered the plot, characterization, mood, pace, and settings of the two works, which elements have been used by courts to determine whether a substantial similarity in works exists. *See, Walker v. Time Life Films, Inc.*, 784 F.2d 44, 49 (2d Cir.1986) (plot, dramatic structure, pace, characters); *Litchfield v. Spielberg*, 736 F.2d 1352, 1357 (9th Cir.1984) (sequence of events, mood, dialogue, and characters). As a result of this review, the court concludes that no reasonable jury could find that "an average lay observer would recognize the alleged

---

**2.** The plaintiff has enumerated for the court a number of similarities between the two works. For example, she listed that: (1) both countries' names end in the letter "a", (2) Sharaf rode MARTA, whereas Akeem and Lisa rode the subway, and (3) both Sharaf and Akeem bought jewelry for women. Such lists of similarities between two works are "inherently subjective and unreliable," particularly where the list contains random similarities. *Litchfield v. Spielberg*, 736 F.2d 1352, 1356 (9th Cir.1984). Many such similarities could be found in very dissimilar works.

copy as having been appropriated from the copyrighted work." *Original Appalachian Artworks, Inc.*, 684 F.2d at 829.

First, and most significantly, the plots differ greatly. Akeem chose to come to the United States and his sole purpose in doing so was to find a woman who liked him for himself, not because he was royalty. Sharaf was initially reluctant to come to the United States and did so only because he was so directed by his grandfather, whose goal was to have Sharaf receive a technical education that would enable him to become a better leader of his impoverished country.

In order to insure that interested women were not attracted by his royalty, Akeem went to great lengths to hide his wealth and royal status, including living in a dilapidated apartment in a poor neighborhood and working at a fast food restaurant. Sharaf appeared quite willing to flaunt his royal background and wealth, although he had initially informed his grandfather that he wanted to live like an average American. (*See*, e.g., AH at 73–74).

Although both Akeem and Sharaf ultimately married women whom they had met in the United States, the courtships that led to those marriages differed greatly. Akeem nurtured a quiet admiration for Lisa, who initially ignored Akeem as a romantic suitor, until he was gradually able to capture her interest. Sharaf, on the other hand, once attracted to his two women, both of whom were romantically interested in him almost from the first meeting, was quite direct in his expressions of interest.

Likewise, the nature of the relationships differed greatly. Although romantically interested in each other by the end of the movie, Akeem and Lisa's relationship was relatively chaste, with the couple not engaging in sexual activity until after their marriage. The expression of the relationship between Sharaf and his two women, however, focused largely on the passionate, physical attraction and activities between the prince and these women.

Further, the romantic "goal" of each protagonist differed. In "Coming to America," Akeem was interested immediately in Lisa and sought to have her fall in love with him. In *The Arab Heart*, however, the romantic dilemma for Sharaf came down to which of the two women to whom he felt a strong attraction, and who each felt strongly attracted to him, he should choose.

In addition, the relationships developed differently. In "Coming to America," the movie ends, in a happily ever after fashion, with the wedding of Akeem and Lisa. In *The Arab Heart*, however, the book does not end with the wedding between Sharaf and Flora, but instead looks beyond the wedding to Flora's difficulty in adjusting to Whadan life, to the birth of her son, and to the marital woes that occur when Flora discovers Sharaf in bed with a servant girl. Not quite the idyllic, happily ever after ending of "Coming to America," at least for Flora, *The Arab Heart* concludes with a reconciliation between Flora and Sharaf, but also with a suggestion that the prince may continue his philandering, albeit in a more discreet fashion.

Moreover, in "Coming to America," the romantic quest of Akeem to find a good woman who would love him for himself was the only theme of the work. In *The Arab Heart*, however, as noted, the notion of finding a wife was not the purpose for Sharaf's visit to the United States. Although Sharaf's attraction to two women and the uncertainty as to how he would resolve this dilemma was an important part of *The Arab Heart*, there were other equally important thematic plots at work, the most paramount of which was the constant threat to the throne and to Sharaf's life posed by his uncle's efforts to achieve a violent coup. Several homicides occur in *The Arab Heart* and a great deal of its plot focuses on the violent attempts on Sharaf and the king's life, with the book ending after Sharaf's ascension to the throne following the murder of his grandfather.

The characterization of the protagonist is likewise very different. Akeem is a humble, kind, gentle and seemingly innocent individual. Sharaf, on the other hand, is sophisticated, worldly, sometimes arrogant, and always royal in his bearing.

The mood of each work also differs greatly. "Coming to America" is a light, romantic movie, with humor in most of the scenes. The movie gives no hint that there are any social problems in Zamunda, which, in the few brief scenes in which it is depicted, is portrayed as an idyllic, wealthy, tropical kingdom. *The Arab Heart*, however, is more serious, with a much less humorous tone. Indeed, in addition to focusing on the intensely physical relationships between Sharaf and the two women whom he dates and the constant violent efforts to overthrow the kingdom of Whada, the book also deals somewhat with social themes, including racial prejudice and tolerance, intermarriage between persons of different racial backgrounds, and poverty in the underdeveloped country of Whada.

The settings of the two works also differ. Akeem is from a seemingly prosperous, peaceful country in Africa, while Sharaf is from an underdeveloped, strife ridden country in Arabia. While in America, Akeem lives in a slum-like neighborhood in New York City; Sharaf lives in a clean and comfortable boarding house near a college campus in the South.

Both works are relatively fast in pace, although *The Arab Heart* covers approximately a two year period in time, while "Coming to America" quickly moves through an approximately forty day period of time.

For all the above reasons, this court concludes that no reasonable trier of fact could find that the copyrightable portions of the two works are substantially similar. The non-moving party has not shown that there is a genuine issue of material fact, and this court hereby grants the defendant's motion for summary judgment.

For the foregoing reasons, IT IS HEREBY ORDERED AND ADJUDGED that the Motion for Summary Judgment [8–1] is GRANTED and the motion to intervene [22–1] is DENIED as moot.

SO ORDERED.