**Alveda King BEAL, Plaintiff–Appellant,**

v.

**PARAMOUNT PICTURES CORPORATION, et al., Defendants–Appellees.**

No. 92–8902.

United States Court of Appeals, Eleventh Circuit.

May 11, 1994.

Alveda King Beal, pro se.

Earline Smith–Montgomery, Atlanta, GA, for appellant.

June Ann Sanders, Nicholas Nathaniel Leach, Lesley G. Carroll, Troutman Sanders, Atlanta, GA, for appellees.

Before ANDERSON and CARNES, Circuit Judges, and SCHLESINGER *, District Judge.

* Honorable Harvey E. Schlesinger, U.S. District Judge for the Middle District of Florida, sitting by designation.

ANDERSON, Circuit Judge:

In this copyright infringement case, Alveda King Beal appeals the district court's grant of summary judgment in favor of the defendants below, Paramount Pictures Corp. and Eddie Murphy. The court rejected the claim that the movie "Coming to America" violated the copyright in Beal's adventure novel *The Arab Heart.* 806 F.Supp. 963 (N.D. Ga.1992). Because we agree with the district court's conclusions, we affirm.

## I. THE WORKS

■ When called upon to adjudicate a copyright dispute, a court must compare the works in question. *See Autoskill, Inc. v. National Educ. Support Sys., Inc.,* 994 F.2d 1476, 1490 (10th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 307, 126 L.Ed.2d 254 (1993). With that in mind, we have independently reviewed the book and the motion picture involved in this lawsuit, and will begin by briefly summarizing them.

### A. *The Arab Heart*

Plaintiff–Appellant Alveda King Beal is the author of *The Arab Heart,* a novel she describes as a "historical tale of romance and adventure." The book's protagonist is Sharaf Ammar Hakim Riad, prince and sole heir to the sheikdom of Whada, a fictitious Arabian nation. As the book begins, Sharaf[1] has reluctantly agreed with the plan of his grandfather, Sheik Hussein, to send Sharaf to the United States. Hussein believes the heir would benefit from a year of technical training that would enable Sharaf to improve Whada's oil production. Although initially resisting the plan, Sharaf agrees to attend the Georgia Institute of Technology (Georgia Tech), as long as he is allowed to live as a normal college student.

As Beal contends, *The Arab Heart* has two main plotlines. One involves the political unrest in Whada, manifested by the efforts of Hussein's half-brother, Mansur, to take over the throne by means of force. As heir, Sharaf plays a prominent role in these events,

though they may be characterized as centering on Hussein. For example, before Sharaf leaves for America, Mansur's forces carry out an unsuccessful assassination attempt at the palace involving both Hussein and Sharaf. The other plot involves Sharaf's adventures in America, which soon focus on his romantic exploits. It is this plotline that Beal contends was infringed by "Coming to America."

Upon his arrival in Atlanta, Sharaf and his two bodyguards take up residence in a boarding house near campus. Sharaf shares his apartment with Mark Anderson, a black graduate student who initially harbors a dislike of those from different racial or ethnic groups. As the book progresses, however, Mark begins to appreciate cultures other than his own; this type of enlightenment is a major theme of the book. Through Mark and his girlfriend, Ebony, Sharaf is introduced to Flora Johnston. Flora is a shy college student and songwriter, the daughter of a well-to-do white man and black woman from Savannah. Sharaf is immediately interested in her. However, his attention also is drawn to Claire Eastman, a beautiful but opportunistic white woman from Boston. This "romantic triangle" plays a large role in the book. For example, Sharaf is invited to a Halloween party at the home of Flora's parents in Savannah. At the party, Flora performs a sensual belly dance for Sharaf, and Ebony sings a song Flora has written for him. However, Sharaf has brought Claire to the party as his guest. Although harboring feelings for Flora, Sharaf pursues his romance with Claire and the two become intimate.

During this time, the book also develops the plot regarding unrest in Whada. Hussein travels to Georgia to meet with a financier and arrange the purchase of weapons. At semester break, Sharaf and Mark travel to Whada, where Sharaf undergoes training to prepare him to take over the throne should Hussein die. Hussein, recovering from an attempted poisoning, arranges a dinner at which Sharaf meets Kauthar, the daughter of Hussein's ally. The sheik hopes

---

**1.** Although Beal refers to the protagonist as "Hakim" throughout her briefs—in an effort to show a parallel with Prince Akeem, the main character of "Coming to America"—defendants correctly point out that the book refers to him as either "Sharaf" or "Prince Riad."

Sharaf will make Kauthar one of his wives, but Sharaf resists. In the spring, Sharaf returns to Whada to quell an uprising by Mansur's forces; one of Mansur's sons is killed in the fight. During this visit, Sharaf tells Hussein that he is thinking of marrying both Claire and Kauthar. However, he also is influenced by his parents' atypical (for Whada) monogamous marriage and his attraction to Flora; he returns to Atlanta to finish school unsure of whom he should marry (and of how many wives he should have).

Upon his return, Sharaf overhears Claire's conversation with a friend that reveals her prejudice and her intolerance of Arab customs. This ends any interest Sharaf had in marrying Claire. He rekindles his romance with Flora, and the two are married a few weeks later at her parents' home. Sharaf tells Flora and her father that he will try living with only one wife, although he is entitled to more. After the marriage, the book skips forward a year, with Sharaf and Flora living in Whada. Hussein does not fully accept Flora, largely because she has failed to give Sharaf a son. When Flora finally does become pregnant, she finds her husband in bed with a servant, which causes a strain in the marriage. The couple eventually reconciles, with an implicit understanding that Sharaf will continue his occasional infidelities but will be more discreet. Flora delivers a son, and exerts her influence to convince Sharaf to give more help to the needy of Whada. In a final battle, both Hussein and Mansur are killed. Sharaf becomes ruler of Whada, with Hussein's dying wish that Sharaf seek and value Flora's opinion.

### B. "Coming to America"

"Coming to America" is a romantic comedy released by defendant Paramount Pictures. The film begins on the twenty-first birthday of Akeem, Prince of Zamunda (portrayed by defendant Eddie Murphy). Although little detail is given regarding the country, Zamunda is an African nation with a lavish royal palace situated in what appears to be a lush tropical forest. Akeem's father states that the time has come for the prince to take a bride; following Zamundan custom, a wife

has been chosen for Akeem. The prospective bride is introduced at an elaborate ceremony. Akeem speaks with her in private; it becomes clear that she has been raised to show total subservience to her husband. After commanding her to do several demeaning acts, and her ready compliance, Akeem decides he would prefer an independent wife with her own opinion. He seeks his father's permission to search for such a bride in America. The king resists, but finally allows Akeem to go to the United States for forty days to "sow his royal oats," after which time he shall return and marry his arranged bride. Akeem accepts this arrangement, but secretly plans to find a wife of his choice in America.

Akeem is accompanied to America by his friend and companion Semmi. The prince concludes that the logical place to search for a future queen of Zamunda is Queens, New York. Throughout his sojourn in America, Akeem is determined to find a woman who values him for himself, not for his wealth or position. To this end, he goes to great lengths to hide his true identity. His luggage and fine clothes are stolen, but Akeem does not mind. Akeem and Semmi take a dilapidated apartment in a tenement. The pair initially searches for suitable brides in a nightclub, but finds only comically inappropriate women. Neighborhood residents tell Akeem that he may have more luck at a black awareness rally. At the rally, Akeem first sees Lisa McDowell, a community activist and daughter of the owner of a fast-food restaurant. He is immediately attracted to Lisa; Akeem and Semmi take jobs in the restaurant so Akeem can get to know Lisa. Akeem soon learns that Lisa has a boyfriend, Darryl, the son of a family that owns a line of hair-care products. The Akeem–Lisa–Darryl triangle plays a major role in the movie. Lisa attempts to get Akeem interested in her sister Patrice, but Akeem continues to pursue Lisa.

Several comic episodes take place with Akeem and Semmi in the restaurant, including the foiling—with a mop handle—of an armed robbery. Other scenes focus on the developing Akeem–Lisa relationship. During a party at Lisa's parents' house, Lisa becomes

angry with Darryl for announcing their engagement without first asking her. Akeem comforts Lisa and the two begin to date. Akeem continues to hide his true identity. However, Semmi tires of living the "common" life and wires Akeem's parents for more money. This request brings the king and queen to America, where the king tells Lisa that she would be an inappropriate bride for Akeem. Stung by the king's comments and Akeem's dishonesty in hiding his identity, Lisa rebuffs Akeem's proposal of marriage. Akeem returns to Zamunda, apparently to enter into the arranged marriage. However, when he lifts the bride's veil, he sees that it is Lisa. The movie ends immediately after the couple's marriage, when Akeem says he is willing to give up his kingdom for Lisa and she replies that the sacrifice won't be necessary.

## II. THE PROCEEDINGS

Although not directly relevant to this case, we note that the movie "Coming to America" has been the subject of another lawsuit that drew a good deal of attention. We mention this because the differences between the cases highlight the issues in this case. In the previous lawsuit, humorist and author Art Buchwald[2] sued Paramount and others in an action for breach of contract, claiming that "Coming to America" was based on a film proposal written and submitted by Buchwald. *Buchwald v. Paramount Pictures Corp.,* 13 U.S.P.Q.2d (BNA) 1497, 1990 WL 357611 (Cal.Super.Ct.1990). It is crucial to note that *Buchwald* was not a copyright infringement suit. The court found that a contract existed between Buchwald and the defendants, and that "Coming to America" was "based upon" Buchwald's proposal, which entitled Buchwald to payment pursuant to a contract between the parties. *See Buchwald,* 13 U.S.P.Q.2d at 1501–02, 1506. The court was careful to emphasize that its finding that "Coming to America" was "based upon" Buchwald's proposal was premised on

much different ground than a copyright claim. *See id.* at 1502–03. In essence, liability was found because Paramount had used Buchwald's *idea* as a basis for the movie. *Id.* at 1503.[3]

On the other hand, a basic premise of copyright law is that, while *expression* is protected, *ideas* are not the proper subject of copyright. 17 U.S.C. § 102(b); *Baker v. Selden,* 101 U.S. 99, 103, 25 L.Ed. 841 (1880). Therefore, copyright infringement exists only if protected expression is wrongfully appropriated. To prevail in the present case, Beal must show more than Buchwald was required to prove. Moreover, while the defendants here may have appropriated Buchwald's ideas, that would not necessarily preclude appropriation also of Beal's expression.

The district court, after summarizing the works and surveying the law, found that summary judgment for the defendants was supported on two grounds: that any similarity between *The Arab Heart* and "Coming to America" concerned only noncopyrightable elements of the book, and that no reasonable jury, properly instructed, would find the two works to be substantially similar. 806 F.Supp. at 967. The court based this conclusion upon consideration of the works' plots, characterizations, mood, pace, and settings. *Id.* Beal then brought this appeal, alleging various errors of law and fact.

## III. LEGAL ANALYSIS

### A. Summary Judgment Standards

▌ Summary judgment is proper when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Evidence is viewed in a light most favorable to the nonmoving party, *United States v. Four Parcels of Real Property,* 941 F.2d 1428, 1437 (11th Cir.1991) (en banc); this, however, does not mean that we are constrained to accept all the nonmovant's factual characterizations

---

**2.** Buchwald originally was a defendant in the instant case, but was dismissed early in the litigation.

**3.** Another unreported decision rejected a copyright infringement claim brought by parties unre-

lated to Buchwald and Beal against Paramount, Murphy, and others regarding "Coming to America." *Gregory v. Murphy,* Copyright L.Rep. (CCH) ¶ 26,707, *reported as table case,* 928 F.2d 1136 (9th Cir.1991).

and legal arguments. If no reasonable jury could return a verdict in favor of the non-moving party, there is no genuine issue of material fact and summary judgment will be granted. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). We review the district court's grant of summary judgment de novo. *Vernon v. FDIC,* 981 F.2d 1230, 1232, *reh'g en banc denied,* 990 F.2d 1270 (11th Cir. 1993).

■ Some courts have observed that summary judgment is peculiarly inappropriate in copyright infringement cases due to their inherent subjectivity. *See Hoehling v. Universal City Studios, Inc.,* 618 F.2d 972, 977 (2d Cir.), *cert. denied,* 449 U.S. 841, 101 S.Ct. 121, 66 L.Ed.2d 49 (1980). Beal's reply brief states this premise, although it also notes that there is no issue in this case regarding the propriety of summary judgment. In any event, courts have been willing to grant summary judgment in infringement cases when it is clear that the moving party is entitled to judgment as a matter of law. *See, e.g., Hoehling,* 618 F.2d at 979; *Evans v. Wallace Berrie & Co.,* 681 F.Supp. 813 (S.D.Fla.1988).

**B. Test for Determination of Infringement**

■ To establish copyright infringement, two elements must be proven: ownership of a valid copyright, and copying of constituent elements of the work that are original. *Feist Publications, Inc. v. Rural Telephone Service Co.,* 499 U.S. 340, 111 S.Ct. 1282, 1296, 113 L.Ed.2d 358 (1991); *Bellsouth Advertising & Publishing Corp. v. Donnelley Info. Publishing, Inc.,* 999 F.2d 1436, 1440 (11th Cir.1993) (en banc). For purposes of its motion for summary judgment, Paramount concedes that Beal holds a valid copyright in

*The Arab Heart;* therefore, only copying is contested.

■ In recognizing that plaintiffs rarely have direct evidence on this issue, courts have developed methods by which copying can be proven indirectly. The approach applied in this Circuit involves a two-part test for indirect proof of copying. The plaintiff is first required to show that the defendant had access to the plaintiff's work; second, the plaintiff must show that the defendant's work is substantially similar to the plaintiff's protected expression. *Original Appalachian Artworks, Inc. v. Toy Loft, Inc.,* 684 F.2d 821, 829 & n. 11 (11th Cir.1982). A court may grant summary judgment for a defendant if the similarity between the works concerns only noncopyrightable elements, or if no reasonable jury upon proper instruction would find that the two works are substantially similar.[4] *Warner Bros., Inc. v. American Broadcasting Cos.,* 720 F.2d 231, 240 (2d Cir.1983). Because the Copyright Act protects "original works of authorship," 17 U.S.C. § 102(a), the "*sine qua non* of copyright is originality." *Feist Publications, supra,* 499 U.S. at 345, 111 S.Ct. at 1287. Material that is not original cannot be copyrighted. In addition to broad ideas, noncopyrightable material includes "*scènes à faire*"—stock scenes that naturally flow from a common theme. *See, e.g., Walker v. Time Life Films, Inc.,* 784 F.2d 44, 50 (2d Cir.) (no protection for common elements in police fiction, such as "drunks, prostitutes, vermin and derelict cars" and "foot chases and the morale problems of policemen, not to mention the familiar figure of the Irish cop"), *cert. denied,* 476 U.S. 1159, 106 S.Ct. 2278, 90 L.Ed.2d 721 (1986); *Evans v. Wallace Berrie & Co.,* 681 F.Supp. at 817 ("Such similarities as using a sand dollar as currency, foods

4. The term "substantial similarity" in copyright infringement actions has not always been used with precision. *See generally* 3 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 13.03[A] (1993); Alan Latman, *"Probative Similarity" as Proof of Copying: Toward Dispelling Some Myths in Copyright Infringement,* 90 Colum.L.Rev. 1187 (1990). It has been defined as existing "where an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work." *Original*

*Appalachian Artworks,* 684 F.2d at 829 (citations and internal quotations omitted). However, as we have recognized, substantial similarity is properly an examination into the existence of infringement, and as such must focus on similarity of expression, *i.e.,* material susceptible of copyright protection. *Id.* at 829 n. 11. Thus both paths that lead to summary judgment—similarity that concerns only noncopyrightable elements, or the impossibility of a properly instructed jury finding substantial similarity—may involve a similar inquiry.

made of seaweed, seahorses for transportation and plates made of oysters or mother of pearl are not protected similarities of expres'sion, but are more accurately characterizations that naturally follow from the common theme of an underwater civilization.").

### C. Application of Law to Facts

In the present case, Paramount concedes access for purposes of the summary judgment motion only. This leaves "substantial similarity" as the crucial issue. The district court found that no reasonable jury, properly instructed, could find *The Arab Heart* and "Coming to America" substantially similar, and also found that any similarities involve noncopyrightable elements. 806 F.Supp. at 967. We agree that although there are a few broad similarities between the works, they involve ideas and other general themes that are not susceptible to copyright protection.

 Beal argues that because there is clear and convincing proof of access, she should be required to prove a degree of similarity lesser in quantum than the standard "substantial similarity." We first note that this contention, known as the inverse-ratio rule, *see Shaw v. Lindheim,* 919 F.2d 1353, 1361 (9th Cir.1990), was raised for the first time in Beal's reply brief and therefore should be deemed to be waived. *See Jackson v. United States,* 976 F.2d 679, 680 (11th Cir.1992). In addition, the inverse-ratio rule has never been applied in this Circuit. Finally, even though Paramount conceded access for purposes of the summary judgment motion, even convincing proof of access does not do away with the necessity of finding similarity. *See Shaw,* 919 F.2d at 1361 ("[A]ccess without similarity cannot create an inference of copying.").

 The district court noted that the book and the motion picture do share a few general similarities. Both involve young crown princes from wealthy royal families coming to America, where they meet the women they will marry. Both feature a strong ruler who (with varying degrees of intensity) initially prefers that the prince enter into an arranged marriage. However, as the court noted, these generalized themes are in the realm of ideas, which are not

protected by copyright. 806 F.Supp. at 967. In addition, the book and the movie diverge sharply from these broad similarities. *Id.* Both before the district court and this court, Beal has presented lengthy lists of elements she claims were appropriated by Paramount. The district court correctly noted that such lists are " 'inherently subjective and unreliable,' particularly where the list contains random similarities. Many such similarities could be found in very dissimilar works." *Id.* at 967 n. 2 (citation omitted). Contrary to Beal's assertion, the district court did not ignore these other claimed similarities. The court's subsequent analysis amply demonstrates that some of the similarities consist of noncopyrightable elements, while others cannot fairly be considered similarities. Although we have examined all of Beal's claimed similarities, it would be neither useful nor judicious to detail each and every one. Our analysis will make use of a few of the claimed similarities that we consider representative. *See Wavelength Film Co. v. Columbia Pictures Indus.,* 631 F.Supp. 305, 306 (N.D.Ill.1986).

 In evaluating claims of substantial similarity, courts have examined different aspects of the work in question. The district court specifically enumerated plot, mood, characterization, pace, and setting as relevant factors. 806 F.Supp. at 967 (citing *Walker v. Time Life Films,* 784 F.2d at 49, and *Litchfield v. Spielberg,* 736 F.2d 1352, 1357 (9th Cir.1984)). Beal contends that the district court erred in finding insufficient similarities in these aspects. We will examine each aspect independently, adding sequence of events, which Beal argues is also relevant. We keep in mind the practical difficulty of drawing a bright line between idea and expression, *see Peter Pan Fabrics, Inc. v. Martin Weiner Corp.,* 274 F.2d 487, 489 (2d Cir.1960) (L. Hand, J.), and recognize that a genuine issue of material fact would preclude summary judgment.

*1. Plot.*—The similarity in plot between the two works is only on the most basic level. As we have observed, both involve a prince coming to the United States, where he meets a woman he will marry. Beyond the broad

similarity in ideas, however, we find great differences in expression, as well as differences in ideas. Akeem in "Coming to America" wants to make the journey to find an independent wife who values him for himself, not his wealth and position. Sharaf in *The Arab Heart* initially resists going to America, finally giving in to his grandfather's wish that he receive technical training. Thus the purposes of the journeys were entirely different. Akeem went to great lengths to conceal his identity, living in a tenement and working in a fast-food restaurant. In contrast, although Sharaf's expressed intent at the outset was to live as other students do and not be handicapped by the royal wealth, and although he made some modest steps in that direction, living for example in a normal student apartment, Sharaf made his lineage and status known to all and did not hesitate to openly give expensive gifts.[5] Sharaf aggressively pursued both Claire and Flora, who were interested in him almost immediately, while Akeem quietly courted Lisa's favor.

Beal argues that Akeem's quest for a wife parallels Sharaf's voluntary return to America in the spring, when he became intent on marrying either Claire or Flora. This cannot reasonably be seen as a similarity. By the spring, Sharaf had become involved with two American women. His return is prompted by his attraction to Claire and Flora specifically, along with his desire to finish his classes at Georgia Tech. This is very different from Akeem's unguided voyage to America to find a wife. In addition, Sharaf still was considering marriage to Kauthar, the arranged bride, in addition to one of his American women. Akeem, on the other hand, conclusively rejected the idea of an arranged marriage.

Although both works feature a romantic triangle, the mere existence of this device is unoriginal and noncopyrightable. The book's triangle involves Sharaf, Flora, and Claire; the points of the movie's triangle are Akeem, Lisa, and Darryl. Beal argues that the movie has a second triangle involving Akeem, Lisa, and Lisa's sister, Patrice, that is similar to the book's. However, Akeem dates Patrice only once (and agrees to the date unwit-

tingly, at that), whereas Sharaf was intimately involved with both women in his triangle. Beal also maintains that the book features a second triangle with Sharaf, Claire, and Claire's once and future boyfriend, Raymond. However, Raymond plays only the smallest of roles in the book.

Additionally, there is the entire second plot of the book, dealing with the internal problems in Whada. Beal maintains that this plot is irrelevant because Paramount appropriated only the romantic plot. In other words, she claims that most (if not all) of the movie is derived from the book, although not all of the book is in the movie; therefore we should disregard the book's second plot. Beal cites no authority for this proposition. We think that the existence of the second plot is relevant because it greatly influences the mood of the book. Even if we accept Beal's argument, however, we would reach the same conclusion. The plots regarding the princes' adventures in America contain basic similarities that are not subject to copyright protection. Beyond that, they differ enough to preclude a finding of substantial similarity.

*2. Mood.*—The general mood of the two works differs greatly. *The Arab Heart* is a serious work with few lighter overtones, whereas "Coming to America" is a quintessential light romantic comedy. Sharaf's relationships with Claire and Flora are much more physical than that of Akeem and Lisa. The book includes several episodes of political violence, while the movie features only a foiled robbery attempt with something of a humorous slant. "Coming to America" draws much humor from the situation of having a wealthy prince masquerade as an impoverished visitor to this country, whereas Sharaf's interactions with Americans focus on exchanges of culture and tradition. There are a very few isolated instances of comedy relief in the book, but they are largely dissimilar to those in the film. The similarities that Beal attempts to highlight—for example, both works feature dogs whose names begin

5. Akeem's sole extravagant gift to Lisa, a pair of earrings, was given anonymously.

with the letter D—cannot reasonably be considered substantial.[6]

*The Arab Heart* has as one of its underlying themes the resolution of tensions caused by racial, ethnic, and cultural differences. This theme, which contributes much to the book's mood, is displayed in many ways: the depiction of interracial couples (Flora's parents; Sharaf's Arab father and Egyptian mother; Sharaf and Flora), Mark's changing attitudes, and frequent references to Dr. Martin Luther King, Jr. This theme is notably absent from "Coming to America." Although a black awareness rally takes place and characters briefly discuss Dr. King, these features are used only for comic effect and to advance the romantic plot. Both princes are subjected to a small amount of taunting regarding their national origin, but the scenes are not substantially similar. In any event, showings of prejudice and ignorance toward those from other continents are *scènes à faire* in stories of foreigners abroad.

3. *Characterization.*—The protagonists of the two works share one broad similarity: they are crown princes and sole heirs to the thrones of foreign nations who have come to America. From this point, the characterizations of Sharaf and Akeem vary greatly. Both show some degree of rebellion from tradition, but this rebellion is manifested in different ways. Sharaf, often described as a "young lion," tends to be brash and impetuous. He wishes to bring social change to Whada by achieving greater equity in wealth distribution, but he accepts many of the harsh (by Western standards) traditional customs, such as notion that women are to be subservient to a degree and men are not expected to be totally monogamous. Akeem primarily rebels against a single tradition, that of arranged marriage. He also shows distaste for some of the more ostentatious traditions regarding Zamundan royalty (for example, the spreading of rose petals where royals walk). This, however, has little in common with Sharaf's character. Sharaf does refuse to live lavishly in Atlanta, but he certainly allows himself more creature comforts than Akeem.

A marked disparity exists between the general attitudes of Sharaf and Akeem. Sharaf is aggressive and imperious at times, as evidenced by his conduct during college registration (when he becomes angry because he has not been given a private suite), when approached by a woman on a bus (when he tells her she should be glad she "still [has] the skin on [her] back"), and when called "olive skin" by a football player (where he says he has decided to spare the athlete's life). His treatment of women, although perhaps progressive by Whadan standards, clearly displays his belief in their subservient role. Sharaf's sexual encounters are marked by physical aggressiveness; he treats his partners other than Claire and Flora with an attitude bordering on disdain. Akeem, on the other hand, courts Lisa quietly and nonaggressively, although with some persistence. He does not show Sharaf's short temper and refrains from striking out when others do not treat him with a measure of respect. In total, as the district court observed, Akeem is humble, kind, gentle, and seemingly innocent. His foiling of the armed robbery shows some aggressiveness, but it is totally unlike the aggressive nature of Sharaf's personality. When Akeem requests his intended arranged bride to hop on one foot and bark like a dog, it is not evidence of his view of women; rather, it shows the type of spouse he wishes to avoid.

Beal asserts that both protagonists wanted wives with similar qualities. While Sharaf finally decides to have only Flora for a wife, he is constantly concerned about the ability of an American woman to adapt to Arab customs. A dying Hussein does tell Sharaf to listen to Flora's opinion, but this comes late in the book. Akeem's stated purpose for coming to America was to find a wife who thinks for herself. From the start Akeem wants a bride who is nontraditional for Zamundan royalty, whereas Sharaf finally concludes that Flora reminds him of his mother.

Beal argues that Akeem's companion Semmi is a composite of Sharaf's bodyguards and

---

6. To illustrate this point, we note that the dogs appear in entirely dissimilar circumstances. In the book, the dog is owned by the proprietor of Sharaf's boarding house and does little. In the movie, the dog is owned by Lisa's parents and is ordered to attack Darryl, Lisa's would-be fiance. Moreover, the role of the dog is insignificant in both works.

Mark, his roommate (in addition to Sharaf's horse, Samir). Semmi, however, is a comic character who quickly tires of living the common life and passes himself off as the prince; these are characteristics wholly absent from any character in *The Arab Heart*. Other characters in the two works are likewise dissimilar.

*4. Pace.*—"Coming to America" is fast paced, covering Akeem's forty days in Queens and ending with his marriage to Lisa, presumably shortly thereafter. *The Arab Heart* takes place over two years. Beal contends that the relevant time frame for the book is Sharaf's nine months in Atlanta. Even if Beal's argument is accepted, the time frame of the book is several times that of the movie. Although both works are relatively quick in pace, any similarity is not sufficient to weigh heavily in Beal's favor.

*5. Setting.*—The district court considered setting broadly, comparing Whada with Zamunda and Akeem's living conditions in Queens with those of Sharaf in Atlanta. Beal contends that an examination of setting should encompass any identifiable location where a significant scene takes place, but cites no authority for this proposition. Our independent research has not given a definitive answer. Although we believe the settings analyzed by the district court obviously are relevant, we will examine Beal's alleged similarities on a more specific level as well.

Both works begin in or near a palace. Beal argues that the film's palace appears similar to the palace on the book's cover.[7] However, the idea of a mosque-style palace with minarets is a *scène à faire* in a story about Arabian or African royalty. The fact that both palaces are lavish and contain private quarters and baths also is not copyrightable expression. Although both works include scenes in which male characters are bathed by females, such scenes naturally follow in works focusing on wealthy men in countries where women are in a subservient role. These scenes, in addition, play relatively small roles in both the book and movie.

The living quarters of Sharaf are modest but comfortable, in a pleasant neighborhood near Georgia Tech; the one-room apartment shared by Akeem and Semmi is in an extremely rundown area of Queens (in fact, a blind man and his dog had been murdered in the apartment before Akeem's arrival). Both works include visits to fast-food restaurants and nightclub sequences, but such broad similarities are merely *scènes à faire* without a showing of more specific resemblances. For example, Sharaf first sees Claire in a brief visit to a fast-food establishment and thinks of taking a job there, but this thought is never pursued and the restaurant plays a minor role in the story. Akeem, however, does take a job in a restaurant—which is owned by Lisa's father—primarily for the purpose of getting to know Lisa. A good portion of the film takes place in the restaurant. Similarly, the presence of hotels, dining in a restaurant near a window, festivities at a palace, and parties at a private home are not copyrightable elements. As a final illustration, Beal draws a parallel between the Halloween party at Flora's parents' house and the party that Lisa's father throws. However, Sharaf is the guest of honor at the first, while Akeem works as a servant at the latter. The parties themselves are not expression, and the details surrounding the party scenes differ widely in elements of expression.

*6. Sequence of events.*—The similarity in the sequence of events also is insufficient to show infringement. Any work in which the protagonist is royalty visiting America will naturally move from a palace to an airport to some form of lodging. Likewise, all works involving courtship and marriage will feature a wedding, usually near the end of the story. Beyond common elements of the broadest nature, the works have no similarities of detail.

*7. Other claims of similarity.*—In her reply brief, Beal sets out other attributes—theme and dialogue—that she argues must be considered when evaluating substantial similarity. Analysis of these attributes overlaps to a significant extent with those we have examined (for example, theme is similar

---

**7.** The parties did not address the question of whether Beal's copyright in the book extends to the cover art, which is the work of artist Henry Porter.

to plot and mood). Further, an examination of these additional factors would lead to the same conclusion we have already reached: no reasonable factfinder could conclude that "Coming to America" is substantially similar to the copyrightable elements of *The Arab Heart.*

## IV. CONCLUSION

Beal has failed to show genuine issues of material fact regarding substantial similarity between the works in question. If the similarities in general ideas and *scènes à faire* serve to show anything at all, perhaps it is only that "in Hollywood, as in [life] generally, there is only rarely anything new under the sun." *Berkic v. Crichton,* 761 F.2d 1289, 1294 (9th Cir.1985). *See also Ecclesiastes* 1:9 ("[T]here is no new thing under the sun."). The district court's entry of summary judgment for Paramount and Murphy is

AFFIRMED.