[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 10-15140
_____

D.C. Docket No. 9:09-cv-80918-KAM

MILLER'S ALE HOUSE, INC.,

Plaintiff - Appellant,

versus

BOYNTON CAROLINA ALE HOUSE, LLC,

Defendant - Appellee.
_____

Appeal from the United States District Court
for the Southern District of Florida
_____
(December 20, 2012)

Before TJOFLAT and MARTIN, Circuit Judges, and DAWSON,[*] District Judge.

_____

[*] Honorable Robert T. Dawson, United States District Judge for the Western District of Arkansas, sitting by designation.

TJOFLAT, Circuit Judge:

"[T]here is no better friend to any merchant than a fair competitor."[1] Intellectual property law walks a fine line in its quest to preserve such fair competition. On the one hand, it respects the policy of free copying and the free economic competition such copying encourages. See 1 J. Thomas McCarthy, McCarthy on Trademarks & Unfair Competition § 1:2 (4th ed. 2012). On the other hand, it creates a set of exceptions—such as patents, trademarks, and copyrights— that protect consumers from deception and confusion. See id. §§ 1:2, 2:2. Thus, trademark law allows merchants to label their products with source-identifying marks and to protect those marks from infringement, see id. § 2:2, while at the same time maintaining competition by disallowing trademarks in generic terms, see Blau Plumbing, Inc. v. S.O.S. Fix-It, Inc., 781 F.2d 604, 609 (7th Cir. 1986) ("To allow a firm to use as a trademark a generic word . . . would make it difficult for competitors to market their own brands of the same product.").

We are called on today to determine whether Miller's Ale House, Inc. ("Miller's"), a restaurant chain with a location in Boynton Beach, Florida, has common law trademark rights in the term "ale house" and trade dress rights in the interior decoration of its restaurants and, if so, whether its competitor, Boynton

---

[1] J.C. Penney, Good Competitor, The Rotarian, July 1954, at 11.

2

Carolina Ale House, LLC, ("Boynton Carolina"), violated Section 43(a) of the

Trademark Act of 1946 (the "Lanham Act"), 15 U.S.C. § 1125(a) (2006),[2] and the

Copyright Act § 106, 17 U.S.C. § 106, when it adopted a name, decor, and a floor

plan similar to Miller's own.

The United States District Court for the Southern District of Florida granted

summary judgment in favor of Boynton Carolina on all claims.[3]  Miller's,

appealing the court's ruling, argues that the court erred as a matter of law in

finding its trademark infringement claim barred by issue preclusion, in finding its

trade dress not to be inherently distinctive, and in finding its and Boynton

Carolina's floor plans not to be substantially similar.[4] We find no error in the

challenged rulings and affirm.

## I.

Miller's opened its first restaurant/sports bar in 1988.  Since that time,

Miller's has successfully expanded to approximately fifty locations, with the vast

majority in Florida.  Each Miller's location has a different name, but all use some

---

[2]  Section 43 of the Lanham Act is codified in 15 U.S.C. § 1125.  Courts frequently refer to the statute as "Section 43" rather than referring to its location in the United States Code.  For purposes of consistency, we will continue this practice throughout the opinion.

[3]  The District Court, which had jurisdiction over Miller's federal law claims under 28 U.S.C. § 1331, declined to exercise supplemental jurisdiction under 28 U.S.C. § 1367 on Miller's Florida law claims for unfair competition.

[4]  Miller's also contends that the District Court erred in failing to consider two theories of unfair competition that neither party ever brought to its attention. We find this argument to be without merit.

geographic prefix—such as a city, street, or neighborhood—followed by the term "Ale House." For example, the Boynton Beach location is named "Boynton Ale House." Each of Miller's restaurants includes several common features that contribute to the overall image of the brand. In 1998, Miller's predecessor in interest copyrighted five different floor plans used in its various locations. Each of these floor plans contains a different arrangement of the decorative elements common to Miller's restaurants.

Boynton Carolina is a licensee of LM Restaurants, Inc., a restaurant management company located in Raleigh, North Carolina. LM Restaurants created the Carolina Ale House brand, opening the first restaurant in 1998. Unlike the Miller's chain, each Carolina Ale House restaurant displays on its exterior signs the same name, "Carolina Ale House," with the word "Carolina" in a smaller font.

In 2008, the events that led to this litigation began. Boynton Carolina obtained a license from LM Restaurants to open a Carolina Ale House branded restaurant in Boynton Beach, Florida, on Congress Avenue. At this time, Miller's "Boynton Ale House" was already operating a restaurant on Congress Avenue a little over a mile from the planned Boynton Carolina location. The Boynton Ale House employed many of the same common features found in other Miller's restaurants.

4

Prior to opening, Boynton Carolina substantially renovated its building's interior, which had previously been used as a Tony Roma's restaurant. In doing so, Boynton Carolina added many of the features of Miller's restaurants, including walls paneled with dock wood, an exposed kitchen, a bar located at the center of the restaurant topped with a soffit, "high-top" tables in a portion of the restaurant, and the color red for the restaurant's name on its exterior and menus. Furthermore, Boyton Carolina, like Miller's, prefixed many menu items with its name and dressed its staff in dark polo shirts and khakis. Nevertheless, the exterior and interior appearances of Boynton Carolina and Miller's Boynton Ale House differ in several significant ways. Most notably, Boynton Carolina is located in a stand-alone building while the Boynton Ale House is attached to other shops. Boynton Carolina also features a large outdoor area, while Miller's Boynton Ale House has no such area.

## II.

We review a district court's grant of summary judgment de novo. Dippin' Dots, Inc. v. Frosty Bites Distribution LLC, 369 F.3d 1197, 1208 (11th Cir. 2004). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

5

The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986). Though we must view all evidence and reasonable inferences in the light most favorable to Miller's as the nonmoving party, "[t]he mere existence of a scintilla of evidence in support of [its] position will be insufficient." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S. Ct. 2505, 2512, 91 L. Ed. 2d 202 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986) (internal quotation marks omitted).

Thus, Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322, 106 S. Ct. at 2552; Welding Servs., Inc. v. Forman, 509 F.3d 1351, 1356 (11th Cir. 2007). As a result, courts may "isolate and dispose of factually usupported claims," which is "one of the principal purposes of the summary judgment rule." Celotex, 477 U.S. at 323–24, 106 S. Ct. at 2553.

III.

We first address Miller's claim that Boynton Carolina violated Section 43(a)

of the Lanham Act, 15 U.S.C. § 1125(a), when it infringed on Miller's alleged

trademark in the term "ale house."[5]  Miller's has not registered the term "ale

house" as a trademark.  However, "the use of another's unregistered, i.e., common

law, trademark 'can constitute a violation of section 43(a) of the Lanham Act.'"

Crystal Ent. & Filmworks, Inc. v. Jurado, 643 F.3d 1313, 1320 (11th Cir. 2011)

(alterations omitted) (quoting Conagra, Inc. v. Singleton, 743 F.2d 1508, 1512

(11th Cir. 1984)).

In order to prevail, Miller's must show that (1) its mark is valid and thus

protectable and (2) Boynton Carolina adopted an identical or similar mark that

made consumers likely to confuse the two restaurants.  Leigh v. Warner Bros., Inc.,

212 F.3d 1210, 1216 (11th Cir. 2000).  The starting point for an assessment of the

---

[5] Section 1125(a) states in pertinent part:

(1) Any person who, on or in connection with any goods or services, . . . uses in
commerce any word, term, [or] name, . . . which—

> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the
> affiliation, connection, or association of such person with another person, or as to
> the origin, sponsorship, or approval of his or her goods, services, or commercial
> activities by another person,

shall be liable in a civil action by any person who believes that he or she is or is likely to
be damaged by such act.

7

validity of a mark is to query whether or not the purported mark is distinctive. See Welding Servs., 509 F.3d at 1357 (noting that protection is only available to "distinctive" marks).

We recognize four gradations of distinctiveness: fanciful or arbitrary, suggestive, descriptive, and generic. Am. Television & Commc'ns Corp. v. Am. Commc'ns & Television, Inc., 810 F.2d 1546, 1548 (11th Cir. 1987). Marks that are fanciful or arbitrary or suggestive are deemed to be inherently distinctive. Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 768, 112 S. Ct. 2753, 2757, 120 L. Ed. 2d 615 (1992). A descriptive term acquires distinctiveness, called "secondary meaning," when "'the primary significance of the term in the minds of the [consuming] public is not the product but the producer.'" Welding Servs., 509 F.3d at 1358 (quoting Am. Television, 810 F.2d at 1549) (alteration in original). In general, a generic term cannot be appropriated from the public domain and thus cannot receive trademark protection. Id.; Abercrombie & Fitch Co. v. Hunting World, Inc., 537 F.2d 4, 9 (2d Cir. 1976) (noting that the Lanham Act offers no "secondary meaning" exception for generic terms).

8

The Fourth Circuit, in previous litigation between the parties at hand,[6] found that the words "ale house" were "generic words for a facility that serves beer and ale, with or without food, just as are other similar terms such as 'bar,' 'lounge,' 'pub,' 'saloon,' or 'tavern.'" Ale House Mgmt. v. Raleigh Ale House, 205 F.3d 137, 141 (4th Cir. 2000).  The District Court held that Miller's claim was barred by issue preclusion.  We agree.

### A.

The Fourth Circuit case began when Miller's filed suit in 1998 in the District Court for the Eastern District of North Carolina to prevent the first Carolina Ale House from opening.  See Ale House Mgmt, 205 F.3d at 139.  Specifically, Miller's alleged that Raleigh Ale House infringed on its unregistered trademark in the term "ale house" in violation of Section 43(a) of the Lanham Act.[7] Ale House Mgmt., 205 F.3d at 140.

Raleigh Ale House moved for, and was granted, summary judgment.  Id.  On appeal, Miller's argued, among other things, that while "ale house" may be generic for a drinking establishment, it is not generic for a facility that has an extensive

---

[6] For purposes of issue preclusion, an assignee of a trademark "steps into the shoes" of the assignor.  Carnival Brand Seafood Co. v. Carnival Brands, Inc., 187 F.3d 1307, 1310 (11th Cir. 1999).  As a result, this opinion will simply refer to the plaintiff in the Fourth Circuit case, Miller's predecessor in interest, as "Miller's."  The defendant in the Fourth Circuit case was Raleigh Ale House, which, like Boynton Carolina, was a licensee of LM Restaurants, Inc.

[7] Miller's sued on additional counts that are not relevant to this appeal.

food menu.  Id.  The Fourth Circuit, however, found that Miller's "failed . . . to present any evidence that 'ale house' does not refer to institutions that serve both food and beer."  Id. at 140–41.  In contrast, Raleigh Ale House presented "extensive evidence, including citations to newspapers, dictionaries, books, and other publications, that the term 'ale house' is generic, referring to several types of facilities."  Id. at 141 (citing Glover v. Ampak, Inc., 74 F.3d 57, 59 (4th Cir. 1996) to show that such evidence can demonstrate that a term is generic).  It also referenced numerous restaurants unaffiliated with Miller's that incorporate the term "ale house" in their names.  Id.  In affirming, the Fourth Circuit concluded that Miller's had "no protectable interest in the words 'ale house' [because] [t]hey are generic words for a facility that serves beer and ale, with or without food."  Id.

## B.

Issue preclusion "bars 'successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment,' even if the issue recurs in the context of a different claim."  Taylor v. Sturgell, 553 U.S. 880, 892, 128 S. Ct. 2161, 2171, 171 L. Ed. 2d 155 (2008) (quoting New Hampshire v. Maine, 532 U.S. 742, 748-49, 121 S. Ct. 1808, 149 L. Ed. 2d 968 (2001)).  This serves "the dual purpose of protecting litigants from the burden of relitigating an identical issue with the same party or his privy and of promoting judicial economy by preventing needless litigation."  CSX Transp., Inc.

10

v. Bhd. of Maint. of Way Empls., 327 F.3d 1309, 1317 (11th Cir. 2003) (quoting

Parklane Hosiery Co. v. Shore, 439 U.S. 322, 326, 99 S. Ct. 645, 649, 58 L. Ed. 2d

552 (1979)).  We apply issue preclusion when (1) the issue at stake is identical to

the one involved in the prior litigation; (2) the issue was actually litigated in the

prior suit; (3) the determination of the issue in the prior litigation was a critical and

necessary part of the judgment in that action; and (4) the party against whom the

earlier decision is asserted had a full and fair opportunity to litigate the issue in the

earlier proceeding. See CSX Transp., 327 F.3d at 1317.  The latter three

requirements are here met.  Yet Miller's contends that the issue presented in this

case differs from that presented before the Fourth Circuit, for while the Fourth

Circuit considered whether the term "ale house" was generic in 1998, this case

considers whether the term was generic in 2009.[8]

---

[8]  Miller's also argues that the Fourth Circuit's ruling was limited to North Carolina
consumer perception and therefore should have no preclusive effect for Florida consumers.  We
disagree.  Though McCarthy notes that "it is possible that generic usage in a different and remote
location in the U.S. will not be relevant," 2 J. Thomas McCarthy, McCarthy on Trademarks &
Unfair Competition § 12:8.50 (4th ed. 2012) (citing Yellow Cab Co. of Sacramento v. Yellow
Cab of Elk Grove, Inc., 419 F.3d 925, 930 n.4 (9th Cir. 2005)), Miller's did not assert before the
Fourth Circuit common law trademark rights in North Carolina alone.  Instead, both Miller's and
Raleigh Ale House based their arguments on wider use of the term "ale house."  In fact, the
Fourth Circuit specifically considered use of the term "ale house" in Florida.  See Ale House
Mgmt, 205 F.3d at 139, 141 (describing Miller's as an "operator of a small chain of facilities
selling food and beer in Florida and later noting that Miller's "conceded at oral argument that
other Florida food-and-drink facilities incorporate 'ale house' in their names").

11

The passage of time may be a factor in a determination of whether a case involves an identical issue to one litigated previously. But the passage of time between prior and subsequent litigation is not by itself dispositive of non-identical issues. Rather, "the passage of time may evoke <u>change of circumstances which preclude</u> the creation of an estoppel." <u>Int'l Shoe Mach. Corp. v. United Shoe Mach. Corp.</u>, 315 F.2d 449, 455 (1st Cir. 1963) (emphasis added). "[C]hanges in facts essential to a judgment will render collateral estoppel inapplicable in a subsequent action raising the same issues." <u>Montana v. United States</u>, 440 U.S. 147, 159, 99 S. Ct. 907, 976, 59 L. Ed. 2d 210 (1979). A party "need only point to one material differentiating fact that would alter the legal inquiry here and thereby overcome the preclusive effect." <u>CSX Trans.</u>, 327 F.3d at 1317.

Certain issues in trademark law are more likely than others to be altered across time. Fact-intensive issues such as likelihood of confusion and secondary meaning may entail a wholly different inquiry due to significant intervening circumstances between two bouts of litigation. See 4 Louis Altman & Malla Pollack, <u>Callmann on Unfair Competition, Trademarks & Monopolies</u> § 23.37 (4th ed. 2011). The Fifth Circuit has suggested, for example, that a "significant intervening factual change" causing "a change in the minds of the public in the relevant geographic area such that they could immediately associate" a mark with a company could preclude collateral estoppel with respect to the question of

12

secondary meaning.  Test Masters Educ. Servs., Inc. v. Singh, 428 F.3d 559, 576 (5th Cir. 2005) (finding "Testmasters" company not to have met this standard).

The Fifth Circuit has held that the same is not true of a determination that a term is generic.  Confronted with a sixty-year-old case that found the term "pig sandwich" to be "unprotectable for two conflicting reasons," the court explained that

> Dixiepig's assertion that "[t]he words 'pig sandwiches' are purely common English words, generic," would estop the present litigation, as generic terms can never attain trademark protection.  However, Dixiepig also holds that "the evidence failed to show that ['pig sandwich'] had generally acquired a secondary meaning, . . . said words so employed being descriptive."

Texas Pig Stands, Inc. v. Hard Rock Cafe Int'l, Inc., 951 F.2d 684, 691 (alterations in original) (internal citations omitted).  This second basis for the judgment, the court explained, "makes it possible that the term could attain protectable status if it acquired a secondary meaning."  Id.  The answer to this question, the court concluded, "greatly depends on whether the question is asked in 1930 . . . or in 1990."  Id.  A finding of genericism, alone, however, would have barred relitigation, in the estimation of the Fifth Circuit.

The First Circuit, on the other hand, has left the door open for relitigation of the issue of genericism.  In Miller Brewing Co. v. Falstaff Brewing Corp., 655 F.2d 5 (1st Cir. 1981), in considering whether Miller Brewing was precluded by a 1978 Seventh Circuit decision from arguing again that "LITE" was not generic, the

13

court, "[f]or present purposes, . . . assume[d] that a judgment determining a state of facts existing in the 1970's [did] not preclude a fresh determination of a state of facts existing in the 1980's." Id. at 9. Nonetheless, it found that Miller Brewing's evidence was insufficient to show that the issue had changed, without specifying what evidence might have been sufficient. Id.

There is ample reason for a court to resist revisiting a determination of a term's generic quality. As Judge Friendly observed, where a term is generic, "any claim to an exclusive right must be denied since this in effect would confer a monopoly not only of the mark but of the product by rendering a competitor unable effectively to name what it was endeavoring to sell." Abercrombie, 537 F.2d at 10. Accord William R. Warner & Co. v. Eli Lilly & Co., 265 U.S. 526, 529, 44 S. Ct. 615, 616, 68 L. Ed. 1161 (1924) ("The use of a similar name by another to truthfully describe his own product does not constitute a legal or moral wrong, even if its effect be to cause the public to mistake the origin or ownership of the product."). To allow a party to revisit an adverse determination of genericism based on incremental changes to the facts before the court (for example, an expanded marketing strategy) would be to give it a greater than warranted opportunity to monopolize a class of products. Although the Fifth Circuit's conclusion reflects the difficult task that should thus be faced by a party seeking to elevate a generic term into a trademark, we agree with the First Circuit that it must

14

be theoretically possible, where circumstances warrant, for it to be allowed to take on that challenge.

C.

Under the Lanham Act, "the primary significance of the registered mark to the relevant public . . . . shall be the test for determining whether the registered mark has [lost trademark protection by] becom[ing] the generic name of goods or services on or in connection with which it has been used."  15 U.S.C. § 1064(3). There is no clear standard for the inverse situation, when a previously generic term may gain trademark protection.  In only two cases, Singer Mfg. Co. v. Briley, 207 F.2d 519 (5th Cir. 1953), and Goodyear Tire & Rubber Co. v. H. Rosenthal Co., 246 F. Supp. 724 (D. Minn. 1965), have courts held that a term previously found to be generic had been "reclaimed from the public domain by a change in public usage," 2 J. Thomas McCarthy, McCarthy on Trademarks & Unfair Competition § 12:30 (4th ed. 2012).  Both cases involved personal names that were introduced originally as a mark and later fell into generic usage only to be ultimately reclaimed by the original coiner.  Id.  Some courts have gone so far as to suggest that even where evidence of changed consumer perception exists, it is irrelevant in determining whether a once-generic term has acquired distinctiveness.  See Welding Services, 509 F.3d at 1358 ("[E]ven if the name becomes in some degree associated with the source, a generic mark cannot achieve true secondary

15

meaning."); <u>Boston Duck Tours, LP v. Super Duck Tours, LLC</u>, 531 F.3d 1, 21 (1st Cir. 2008) (trademark law does not protect a producer who "has acquired a 'de facto secondary meaning' through its exclusive use of a generic term that causes customers to associate the term with that specific source"). Were changed perception sufficient to warrant the elevation of a non-coined, generic term to trademark status, such change would have to be radical. <u>See</u> 2 McCarthy, <u>supra</u>, § 12:30.

Miller's evidence is wholly inadequate to indicate that, after the Fourth Circuit's decision, such a drastic change occurred in the public's perception of the term "ale house." Miller's offered declarations by two of its customers from Boca Raton, a community located south of Boynton Beach. Unlike a random consumer survey, these statements fail to offer evidence of general public perception. <u>See</u> 2 McCarthy, <u>supra</u>, § 12:14 ("Consumer surveys have become almost de rigueur in litigation over genericness."). These two customers stated that they refer to the Miller's locations where they have eaten as "Ale Houses" and to their local location as "the Ale House" and that they only use the term for Miller's restaurants. Neither, though, stated that he had ever even visited Miller's Ale

16

House or Carolina Ale House in Boynton Beach.[9]  In fact, these customers appear to reside in an area in which Miller's is the only user of the term "ale house," which renders their statements not inconsistent with generic use of the term "ale house."[10]

Miller's also presented employee statements that customers routinely confuse the two restaurants.  Such evidence is irrelevant to our inquiry.  The prominent use of a generic term by two competitors may understandably confuse consumers; however, this does not make the term any less generic.  See Gift of Learning Found., Inc. v. TGC, Inc., 329 F.3d 792, 801 (11th Cir. 2003) ("[C]onfusion . . . is irrelevant unless the mark is protectible in the first instance."); Boston Duck Tours, 531 F.3d at 21 ("[T]rademark law . . . is not intended to prevent confusion between two similar, generic marks.").

Finally, the fact that Miller's expanded its locations and spent more advertising provides little to no indication of public perception, because it has no bearing on how that expansion and advertising was received.  See Abercrombie,

---

[9]  Between them, the two mention explicitly the Ft. Lauderdale Ale House, the Davie Ale House, the Hollywood Ale House, and the Boca Ale House.

[10]  If, for example, Boynton Garden Shop is the only local user of this seemingly generic phrase, residents might well only use the words "the garden shop" in reference to it.  This fact should not inhibit a competitor from opening a "Carolina Garden Shop."

17

537 F.2d at 9 (stating that advertising may not remove a generic term from the public domain).

Miller's evidence fails to indicate any change at all in the public perception of the term "ale house," and the uncontested fact that restaurants and bars unaffiliated with either party use the term "ale house" points in the opposite direction. See Boston Duck Tours, 531 F.3d at 19 (stating that generic use by third parties is evidence that the term is generic).

In the absence of any indication of differentiating facts materially relevant to our inquiry, see CSX Transp., 327 F.3d at 1317, we agree with the District Court that Miller's is bound by the Fourth Circuit's decision. Miller's still has "no protectable interest in the words 'ale house' [because] [t]hey are generic words for a facility that serves beer and ale, with or without food." Ale House Mgmt., 205 F.3d at 141. Because a generic name may not receive trademark protection, the District Court properly granted summary judgment on Miller's trademark infringement claim.

## IV.

We now turn to Miller's claim that Boynton Carolina infringed on its unregistered trade dress in violation of Section 43(a) of the Lanham Act, 15 U.S.C.

§ 1125(a) (2006).[11]  "The term 'trade dress' refers to the appearance of a product when that appearance is used to identify the producer."  Dippin' Dots, Inc. v. Frosty Bites Distribution, LLC, 369 F.3d 1197, 1202 (11th Cir. 2004) (quoting Publ'ns Int'l, Ltd. v. Landoll, Inc., 164 F.3d 337, 338 (7th Cir. 1998)).  "Trade dress is a complex composite of features and the law of unfair competition in respect to trade dress requires that all of the features be considered together, not separately."  Am. Greetings Corp. v. Dan-Dee Imports, Inc., 807 F.2d 1136, 1141 (3d Cir. 1986) (quoting SK & F, Co. v. Premo Pharm. Labs., 481 F. Supp. 1184, 1187 (D.N.J. 1979)) (internal quotation marks omitted).  The features "may include . . . size, shape, color or color combinations, texture, graphics, or even particular sales techniques."  AmBrit, Inc. v. Kraft Inc., 812 F.2d 1531, 1535 (11th Cir. 1986) (quoting John H. Harland Co. v. Clarke Checks, Inc., 711 F.2d 966, 980 (11th Cir. 1983)).

To bring a successful trade dress infringement claim under the Lanham Act, a plaintiff must prove that (1) the defendant's product is confusingly similar to its

---

[11] While the text of Section 43(a)(1) does not include the term "trade dress," see note 5 supra, trade dress "constitutes a 'symbol' or 'device' for purposes of [Section 43(a)(1)]."  Wal-Mart Stores, Inc. v. Samara Bros., Inc., 529 U.S. 205, 209, 120 S. Ct. 1339, 1342, 146 L. Ed. 2d 182 (2000); see 15 U.S.C. § 1125(a)(1).  "This reading of . . . § 43(a) is buttressed by . . . § 43(a)(3), which refers specifically to 'civil action[s] for trade dress infringement under this [Act] for trade dress not registered on the principal register.'"  Id. (citing 15 U.S.C. § 1125(a)(3)).

product; (2) the similar features of the two products are primarily non-functional;[12] and (3) the plaintiff's product is distinctive. Dippin' Dots, 369 F.3d at 1202. The District Court held that Miller's did not meet its burden of demonstrating the "appropriated" elements to be distinctive and, as a result, granted summary judgment against Miller's on its trade dress claim without addressing whether the products are confusingly similar or whether the common features are primarily non-functional. See Dippin' Dots, 369 F.3d at 1202 ("[A]s all three elements are necessary for a finding of trade dress infringement, any one could be characterized as threshold.") (quoting Epic Metals Corp. v. Souliere, 99 F.3d 1034, 1039 (11th Cir. 1996)) (internal quotation marks omitted). We agree with the District Court's assessment that Miller's has not shown its trade dress to be distinctive, an essential element of its trade dress claim.

Although the text of Section 43(a) does not "explicitly require[] a producer to show that its trade dress is distinctive, . . . courts have universally imposed that requirement, since without distinctiveness the trade dress would not 'cause confusion . . . as to the origin, sponsorship, or approval of [the] goods.'" Wal-Mart Stores, Inc. v. Samara Bros., Inc., 529 U.S. 205, 210, 120 S. Ct. 1339, 1343, 146

---

[12] The parties disagree as to whether summary judgment was appropriate on the ground that Miller's failed to present any evidence to demonstrate the non-functionality of its trade dress. Appellee Br. 30; Reply Br. 23–24. Because we dispose of this case based solely on the distinctiveness prong of the infringement test, we see no need to address the issue.

L. Ed. 2d 182 (2000).  Trade dress may become distinctive in two ways.  Some

trade dress, "because [its] intrinsic nature serves to identify a particular source of a

product, [is] deemed inherently distinctive."  Two Pesos, 505 U.S. at 768, 112

S. Ct. at 2757.  Other trade dress, though not inherently distinctive, can become

distinctive if it acquires "secondary meaning, which occurs when, in the minds of

the public, the primary significance of [trade dress] is to identify the source of the

product rather than the product itself."  Wal-Mart, 529 U.S. at 211, 120 S. Ct. at

1343 (internal quotation marks omitted).  Miller's does not contest the District

Court's conclusion that it presented no evidence to show that its trade dress, as

distinct from its mark, has acquired secondary meaning and consequently that it

failed to raise a genuine issue of material fact as to secondary meaning.  We

therefore limit our inquiry to the question of whether Miller's trade dress is

inherently distinctive.

Prior to the Supreme Court's holding in Wal-Mart, we used the Federal

Circuit's Seabrook test to determine whether or not trade dress could be considered

inherently distinctive.[13]  See Brooks Shoe Mfg. Co. v. Suave Shoe Corp., 716 F.2d

---

[13]  We have used the Abercrombie word-spectrum test, see Abercrombie & Fitch Co. v. Hunting World, Inc., 537 F.2d 4, 9 (2d Cir. 1976), after applying the Seabrook test to support a district court's finding under the Seabrook test, see AmBrit, Inc. v. Kraft Inc., 812 F.2d 1531, 1537 (11th Cir. 1986), but never as the sole tool of analysis for the inherent distinctiveness of trade dress.  As Thomas McCarthy has written: "The Abercrombie spectrum was developed

21

854 (11th Cir. 1983) (initially adopting test); Seabrook Foods, Inc. v. Bar-Well

Foods, Ltd., 568 F.2d 1342 (C.C.P.A. 1977).  See also University of Florida v.

KPB, Inc., 89 F.3d 773, 776 n.5 (11th Cir. 1996) (reciting test); AmBrit, 812 F.2d

at 1537 (using test to find inherent distinctiveness in Klondike ice cream

wrappers).  Under that test, we must consider "whether it is a 'common' basic

shape or design, whether it is unique or unusual in a particular field, and whether it

is a mere refinement of a commonly-adopted and well-known form of

ornamentation for a particular class of goods viewed by the public as a dress or

ornamentation for the goods."  Brooks Shoe, 716 F.2d at 858 (quoting Seabrook,

568 F.2d at 1344) (internal alterations omitted).

   In the course of holding in Wal-Mart that product designs can never be

inherently distinctive, the Court questioned the test's utility in cases involving

product design.  529 U.S. at 213–14, 120 S. Ct. at 1345 ("Respondent and the

United States as amicus curiae urge us to adopt for product design relevant

---

specifically for word marks and does not translate into the world of shapes and designs." 1 J.
Thomas McCarthy, McCarthy on Trademarks & Unfair Competition § 8:13.  Nonetheless,
Miller's argues that we should use the Abercrombie test and cites the Supreme Court's holding
in Two Pesos for support.  Though the Court in Two Pesos does analyze Taco Cabana's claim
using the Abercrombie test, it notes that it does so because "the [Fifth Circuit] followed this
classification and petitioner accepts it."  505 U.S. at 768, 112 S. Ct. at 2757.  In Wal-Mart,
however, the Court refers to the test as applying "[i]n the context of word marks" and, later, as a
"test developed for word marks."  529 U.S. at 210, 212, 120 S. Ct. at 1344.  We do not take the
Supreme Court to have endorsed the Abercrombie test for trade dress claims.

portions of the [Seabrook test] . . . .  Such a test would rarely provide the basis for summary disposition of an anticompetitive strike suit.")

The Court said nothing, however, about the ongoing utility of the test to determine whether or not trade dress might be "inherently distinctive."  See In re Chippendales USA, Inc., 622 F.3d 1346, 1357–58 (Fed. Cir. 2010) ("Nothing in the Wal-Mart decision questioned or undermined the reasoning in Seabrook. Indeed, the Court cited Seabrook but did not express any disagreement with its use to determine the inherent distinctiveness of trade dress . . . .  Under these circumstances, the panel is bound by Seabrook, and only the court en banc may overturn it."); 1 J. Thomas McCarthy, McCarthy on Trademarks & Unfair Competition § 8:13 (4th ed. 2012) (discussing and endorsing the Federal Circuit's retention of the Seabrook test and our use of that test).  This being the case, we follow our precedent and, like the District Court, apply the Seabrook test as articulated in Brooks Shoe to determine whether Miller's trade dress is inherently distinctive.

Miller's argues that the "proper inquiry" under the Lanham Act is not "whether or not other restaurants shared one or more of these elements, but whether other restaurants featured this combination of elements."  Appellant's Br. 27.  It contends that the "composite commercial impression" created by its "interior and layout, the prominent use of the ALE HOUSE logos throughout the

23

restaurants, menu design and placement, method of service, and uniforms is unique

and distinctive" and thus entitled to protection as trade dress. Id. at 29. We

disagree.

We find nothing particularly unique in a restaurant fixing its name in red

letters on the outside of its building and on its menu, branding items it sells with

that name, dressing its staff in khakis and a polo shirt, featuring a center bar with a

soffit, offering seating at "high-top" tables, and paneling its walls with wood.

These are the prototypical features—what we might call the "common . . . design,"

Brooks Shoe, 716 F.2d at 858—of a standard sports bar or brew pub. The

particular name affixed on the wall and to menu items, the specific color of the

polo shirts, the type of wood on the walls, the placement of the "high-top" tables,

and the openness of the kitchen,[14] "even if they in combination could be deemed

unique," Wiley v. American Greetings Corp., 762 F.2d 139, 142 (1st Cir. 1985),

are all "mere refinement[s]" of this "commonly-adopted and well-known form of

ornamentation," Brooks Shoe, 716 F.2d at 858. See Chippendales, 622 F.3d at

1356 (finding Chippendales's "Cuffs & Collar" costume to be a "mere refinement"

of the "pervasive Playboy mark, which includes the cuffs and collar together with

---

[14] The record does not clearly indicate whether or not all of these elements are present at most Miller's locations. We reasonably infer in Miller's favor that they are. See Dippin' Dots, Inc. v. Frosty Bites Distribution, LLC, 369 F.3d 1197, 1201 n.3 (11th Cir. 2004).

24

bunny ears"); Wiley, 762 F.2d at 142 (finding a red heart permanently affixed to the left breast of a teddy bear to be a refinement of others' uses of hearts on other stuffed animals).

In short, we cannot here find that "the design, shape or combination of elements is so unique, unusual or unexpected in this market that [we] can assume without proof that it will automatically be perceived by customers as an indicator of origin—a trademark." 1 McCarthy, supra, § 8:13.  As Miller's has failed to raise a genuine question of material fact as to the essential element of distinctiveness, then, see Dippin' Dots, 369 F.3d at 1202, we cannot find its restaurant interiors to be protectable trade dress.

V.

Finally, Miller's contends that the floor plan of the Boynton Carolina restaurant infringed upon its copyright in Ale House Floor Plan Five, one of its five copyrighted floor plans.[15]

The copyright protection of 17 U.S.C. § 102 (2012) extends to "architectural

---

[15] Differences between Miller's various plans include differences in the size, entrance location, restroom location, seating quantity/arrangement, and pool table quantity/arrangement. For example, Ale House Floor Plan Two has four pool tables and an arcade section in the bottom right corner, some booth seating to the right of the bar, and three columns of high-top tables.  In contrast, Ale House Floor Plan Five ("Floor Plan Five") has two pool tables placed between two columns of high-top seating and no booth seating to the right of the bar.

25

works,"[16] including "interior architecture,"  H.R. Rep. No. 101-735, at 18 (1990),

reprinted in 1990 U.S.C.C.A.N. 6935, 6949.  To establish copyright infringement,

a plaintiff must prove: "(1) ownership of a valid copyright, and (2) copying of

[protectable] elements."  Oravec v. Sunny Isles Luxury Ventures, L.C., 527 F.3d

1218, 1223 (11th Cir. 2008) (quoting Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,

499 U.S. 340, 361, 111 S. Ct. 1282, 1296, 113 L. Ed. 2d 358 (1991)).  The parties

do not dispute the validity of Miller's copyright in Floor Plan Five. Though

Miller's did not introduce direct evidence of copying, a "plaintiff may show

copying by demonstrating that the defendants had access to the copyrighted work

and that the [protectable elements of the] works are 'substantially similar.'"  Id.

(quoting Herzog v. Castle Rock Entm't, 193 F.3d 1241, 1248 (11th Cir. 1999)).[17]

---

[16]  Section 102 states, in pertinent part:

(a) Copyright protection subsists, in accordance with this title, in original works of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device.  Works of authorship include the following categories:

(8) architectural works.

[17]  The District Court, finding that the two floor plans were not substantially similar as a matter of law, did not address the issue of Boynton Carolina's access to Floor Plan Five.  We agree and therefore do the same.

A.

Though disposing of a case at the summary judgment stage is inappropriate in certain kinds of copyright infringement cases, we have approved of such treatment where the "crucial issue" is substantial similarity. Intervest Constr., Inc. v. Canterbury Estate Homes, Inc. 554 F.3d 914, 920 (11th Cir. 2008). This is because "the ability to separate protectable expression from non-protectable expression is, in reality, a question of law or, at the very least, a mixed question of law and fact." Id.

"[I]n an action for infringement, it must be determined both whether the similarities between the works are substantial from the point of view of the lay [observer] and whether those similarities involve copyrightable material." Oravec, 527 F.3d at 1224 (quoting Herzog, 193 F.3d at 1248). We can summarize this in "a single inquiry: whether a reasonable jury could find the competing designs substantially similar at the level of protected expression." Id. at 1224 n.5 (citing Beal v. Paramount Pictures Corp., 20 F.3d 454, 459 n.4 (11th Cir. 1994)) (disapproving of the two-part test used in Herzog). See also Intervest, 554 F.3d at 921 (finding that, "[a]t the level of protected expression, the differences between the designs are so significant that no reasonable, properly instructed jury could find the works substantially similar").

27

B.

In identifying the protected elements of a plaintiff's architectural work, we begin by examining the statutory definition:[18]

> An "architectural work" is the design of a building as embodied in any tangible medium of expression, including a building, architectural plans, or drawings. The work includes the overall form as well as the arrangement and composition of spaces and elements in the design, but does not include individual standard features.

17 U.S.C. § 101. Though "individual standard features"[19] are not protectable (a "grant of exclusive rights in such features . . . imped[ing], rather than promot[ing], the progress of architectural innovation," H.R. Rep. No. 101-735, at 18), "the arrangement and coordination" of such features may be. Intervest, 554 F.3d at 919 (emphasis in original). See also Oravec, 527 F.3d at 1225. This reflects Congress's recognition that "creativity in architecture frequently takes the form of a selection, coordination, or arrangement of unprotectible [sic] elements into an original, protectible [sic] whole." H.R. Rep. No. 101-735, at 18 (quoted in

---

[18] There are additional limitations in copyright law which may complement the statutory definition. Notably, "copyright protection does not extend to ideas but only to particular expressions of ideas. Oravec v. Sunny Isles Luxury Ventures, L.C., 527 F.3d 1218, 1224 (11th Cir. 2008) (citing 17 U.S.C. § 102(b)). In addition, "copyright protection may extend only to those components of a work that are original to the author." Intervest Constr., Inc. v. Canterbury Estate Homes, Inc. 554 F.3d 914, 919 n.2 (11th Cir. 2008) (quoting Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 348, 111 S. Ct. 1282, 1289, 113 L. Ed. 2d 358 (1991)). Because we conclude that substantial similarity does not exist under the statutory definition, we need not discuss the originality requirement and idea/expression dichotomy.

[19] In this case, the alleged common features—a rectangular bar, booth seating, "high-top" tables—are standard for a sports bar or restaurant and, as such, as not protectable.

28

Intervest, 554 F.3d at 919).  In this case, Miller's alleged that Boynton Carolina copied its arrangement of several common features: a rectangular bar at the center of the restaurant, booth seating to the left of the bar, high-top tables to the right of the bar, a kitchen and freezer area in back-right, and restrooms in the back-left.

## C.

The District Court granted summary judgment after concluding that no reasonable jury, limiting its consideration to the arrangement of standard features, could find Boynton Carolina's floor plan substantially similar to Miller's Floor Plan Five.  We agree.

We have previously stated that copyright protection for an architectural work is "thin."  See  Intervest, 554 F.3d at 919 & n.3 (noting that "the definition of an architectural work closely parallels that of a 'compilation'" and that "copyright protection in a compilation is 'thin'" (quoting Feist, 499 U.S. at 349, 111 S. Ct. at 1289)).  Substantial similarity exists only "where an average lay observer would recognize the alleged copy as having been appropriated from the [protectable features of the] copyrighted work."  Oravec, 527 F.3d at 1224 (quoting Original Appalachian Artworks, Inc. v. Toy Loft, Inc., 684 F.2d 821, 829 (11th Cir. 1982)).  In light of the limited scope of protectable expression in an architectural plan, we held in Howard v. Sterchi that "modest dissimilarities are more significant than they may be in other types of art works."  974 F.2d 1272, 1276 (11th Cir. 1992).

29

Because there are only a limited number of ways to turn a rectangular building into a sports bar and restaurant, "similarities in the general layout of rooms can easily occur innocently." Id. Juries recognize this fact when determining whether an alleged copy was "appropriated from the copyrighted work." Oravec, 527 F.3d at 1224 (quoting Original Appalachian Artworks, Inc., 684 F.2d at 829). Consequently, differences between the Boynton Carolina floor plan and Miller's Floor Plan Five would weigh heavily against a finding of substantial similarity. See id. at 1227 ("These differences, as well as others, preclude a finding of substantial similarity.").

After an examination of the respective floor plans, we agree with the District Court "that the differences here are dramatic and overwhelming, and that the similarities between [Boynton Carolina's] layout and Miller's floor plan exist only at the broad conceptual level." Miller's Ale House, Inc. v. Boynton Carolina Ale House, LLC, 745 F. Supp. 2d 1359, 1379 (S.D. Fla. 2010). As the court stated:

> Although both plans contain centrally located bars, for instance, the bars are in different locations relative to each restaurant's entryway; Miller's central bar is on the right while [Boynton Carolina's] is slightly to the left. Much of the interior seating is markedly dissimilar; Miller's has several columns of booth seating to the left of the entryway while [Boynton Carolina] interposes a single column of tables between its booths. [Boynton Carolina] has divided its bathroom entrances from the dining area with a solid wall and Miller's has not. The arrangement of the pool tables and video games inside each restaurant is distinct; Miller's places its pool tables in a column between its tables, while [Boynton Carolina] separates its pool tables from the diners and lines its video games along a wall. The outdoor areas are dramatically

30

different; [Boynton Carolina] has a separate outside corner bar and outside seating that hugs the corner of the building, and Miller's floor plan does not specify any outdoor seating at all.

Id.

While not disputing the accuracy of these differences, Miller's characterizes them as "minor." Our recent copyright decisions involving architectural works indicate otherwise. Compared to the similarities between the two floor plans, the differences between them are at least as significant as those described in Intervest and Oravec. Thus we conclude that "[a]t the level of protectable expression, the differences between the designs are so significant that no reasonable, properly instructed jury could find the works substantially similar." Intervest, 554 F.3d at 921 (quoting Oravec, 527 F.3d at 1227)).

For the foregoing reasons, the judgment of the District Court is AFFIRMED.